May it please the Court, I'm Davina Chen for Malik Smith. Counsel and I have decided to split the time ten minutes each as there's no overlap in the issues. Mr. Smith was convicted of assault with a dangerous weapon, and no one here disputes that use of a dangerous weapon is an element of that offense. And no one disputes that it is a question of fact with a jury. Still, the jury at Mr. Smith's trial was instructed that there are three elements of this crime, and none of those three was the use of a dangerous weapon. Instead, the third element that the jury was instructed on was that the defendant must have used a prison-made knife. Now, there may be some cases in which a prison-made knife is per se a dangerous weapon, but this is not one of those cases. But don't we take the jury instructions as a whole? Yes, Your Honor. And wasn't there a passage, I don't have it in front of me, but wasn't there a passage in the instructions which left it for the jury to decide whether or not this was a dangerous weapon? Actually, Your Honor, the definition of the offense included three elements, none of which included dangerous weapon. And then there was, what the court is referring to, a next passage. And that passage read, a prison-made knife is a dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury. Now, we would concede that if an element of the offense in this case was use of a dangerous weapon, this would be a very appropriate definition of that element. But the third element in this case was that the defendant used a prison-made knife. In other words, this definition was to something that the jury was never instructed was an element. The definition, this final passage that the court refers to, might as well have read, a prison-made knife is made of green cheese if it is used in a way that is capable of causing death or serious bodily injury. Since the jury was never instructed that it needed to find that Mr. Smith used a prison-made knife made of green cheese, it's irrelevant. And on this matter, Brooksby is instructive. This court in a case, U.S. v. Brooksby, considered a prosecution of a tax fraud. And in that case, an element of the offense was that the defendant acted willfully. In that case, the jury was instructed. They were read the statute, which included the term willfully. They were read the indictment, which included the term willfully. They were read a definition of willfully. And they were read an instruction that said in order for the government to prove willfulness, such and such a thing must occur. And this court still found error. It found that you cannot cure the omission of a key element of the offense by reading the indictment or reading the statute or defining that element. In this case, it can't be said that the definition of dangerous weapon cured the omission because the jury was instructed it only needed to find three elements. And one of those elements was not dangerous weapon. The third element was prison-made knife. Now, as I said before, if the prison-made knife in this case was a steel shank or some very strong knife, it could be said that it's per se a dangerous weapon. But in this case, the prison-made knife was made of non-contraband styrofoam prison trays. It was wielded based on the government's evidence by all Mr. Smith's force. And he had the assistant of Mr. Helm, who was described by the government as huge and could crush Mike Tyson like a bug. And yet the injuries that were inflicted were minor, and they required only minor first aid. And the stress of inflicting this minor injury broke the knife. We have testimony that, in fact, it could cause death-threatening injury. There was testimony that it could cause lethal injury if used to strike a vital organ. And the jury considered that evidence. And I – that would go to the question of whether the evidence was sufficient to convict. But what I'm choosing to focus on today is the instructional error. It is not for this Court to comb the record. You're saying essentially that the judge took it away from the jury. Exactly. In other words, he made a finding of law, I suppose. Is that what you're saying? That's what I'm saying, Your Honor. The defendant proposed an instruction which would have been correct. The defense proposed instruction had three elements also. And the third element was that the defendant used a dangerous weapon. And then the definition went, you know, an object is a dangerous weapon if. And I was interested that this was actually the model jury instruction in this case because the government emphasized that below and argued above. So I went and looked at other model jury instructions. And I looked at Devitt and Blackmore. I'm not sure why we still call it that. O'Malley and Grittig. And their definition of assault with a dangerous weapon mimicked the one that the defendant proposed, which is that one of the elements is use of a dangerous weapon. I couldn't find other model jury instructions on this particular offense. But in terms of the offense of 18 U.S.C. 111, which is assault on a federal officer with a dangerous weapon, there were three circuits that had model jury instructions. And all three of them instructed that one of the elements is the use of a dangerous weapon. And then there's a definition of dangerous weapon. So the Ninth Circuit stands alone in its model jury instruction, which allows basically the court to instruct the jury that the government has met its burden of proof. So long as the jury finds that a prison-made knife was used, that's enough. And we would submit, Your Honors, that that omission, the omission of the third element of the offense, is constitutional error. In this case, the court may believe that the evidence, especially from Mr. Misperos, was sufficient to show that the prison-made knife was a dangerous weapon. But it's a jury question. It's not a question for the district court to determine, and it's not a question for this court to determine. Of course, you argued it to the jury. You argued it, and they argued it. There was evidence underlying the argument. You presented the same perspective you're trying to present to us now. This was a foam, quote-unquote, knife and, therefore, could not meet the requirement. And, of course, they showed, no, this was a melted. All of the holes, the foam texture was gone. It was a melted-down piece of plastic and, therefore, a dangerous weapon. Your Honors, I didn't argue the case below. And it was not actually the focus of the defendant's argument below. He did argue it, and he did say at most it was a simple assault, but it was not the focus. And in any case, the jury was not instructed that it needed to find it. And the case law, especially Brooks v. is clear. In Brooks v., it was the focus of the case. The defendant admitted every other element of the offense except for willfulness. The court didn't instruct that willfulness was an element of the offense. I think I'm using up Mr. Rubin's time. And the court didn't instruct that willfulness is an element of the offense, but he did give numerous instructions regarding willfulness. And this Court still found error, and it found reversible error. And the Court doesn't have any further questions now. I'd like to give Mr. Rubin his time. Roberts. You may do so. Mr. Rubin. Thank you. Good morning, Your Honors. May it please the Court, my name is Alan Rubin, and I represent Appellant Charles Hellam. The issue before the Court in Mr. Hellam's case, the first issue is a relatively simple one. He was not present for his third day of trial, as is constitutionally required. And the issue is, frankly, why wasn't he present? The appellant, on behalf of Mr. Hellam, I have no dispute that there are circumstances where an individual can waive, forfeit his right to be present at a trial if he behaves improperly, poorly, or whatever. And in fact, Mr. Hellam, who is admittedly a difficult client and a difficult inmate, acted improperly the first day, and that's not – and in that situation, I suppose it was appropriate for him not – for the trial to proceed on that day. That's not the question before the Court. We didn't appeal that issue. The question is the third day. And the Supreme Court made clear that a defendant who is excluded from trial can reclaim his right to be present. That's what the Allen case says, and Allen – the behavior of the defendant in that case was reprehensible. Cursing, yelling, throwing papers, trying to do whatever to stop the trial. And the Supreme Court said, at any time a defendant can reclaim their right to come back to the trial. And Mr. Hellam did so. The second day of trial, he came to court. He provided no problem. He sat in court. He acted appropriately. He didn't even call out once. He acted entirely appropriately as any other defendant. The third day, why wasn't he there? The record that we found out later, after the trial was over, is that he was drugged. There's no question, I believe, and the record shows, that he was drugged. He was given three to six times the normal dosage of Benadryl. Benadryl is a drug that all of us know from our own experience. I can tell you from my own experience that that is a drug that in normal dosages can knock you out. One to two pills, you're even warned about it. Not to take, that it can knock you out in normal doses. By the government's own evidence, he was given three to six times the normal dosage of Benadryl. So what do we see as his behavior on the third day of trial? His behavior was entirely consistent with someone who had been knocked out by drugs. This is not the situation that happened on day one and everything else that had happened prior. This was not affirmative yelling, screaming, fighting, throwing things, or anything else. Everything he did was consistent with being knocked out. He was laying on his bed. He had covers over his head. He was unresponsive. The closest they got was banging on the door and he started. And that, of course, is consistent with somebody just hearing a loud noise in their sleep. There's not one fact in this record that indicates that he was affirmatively trying to avoid being brought to trial. Well, now, he had an evidentiary hearing on this. What was lacking? We did not have an evidentiary hearing. What happened is afterwards is that, well, there was an evidentiary hearing, but it was after the trial. Thank you. I'm sorry. There was a hearing on it, but at that point, the horse was out of the barn. I mean, you can't call back the jury. It was even too late for a motion for a new trial. The 10 days had already expired. We didn't get the declarations from the nurse about his drugging until three weeks after the verdict. And I would point out that this was a particularly bad day. Of all the days of the trial for Mr. Hellam not to be present, and this goes to the issue of how harmful the error was, it was this particular day. Perhaps the first day wasn't that important. You always want to have your client's input on jury selection and so forth, but usually the lawyers can take care of that. This is the day where two main government witnesses were being cross-examined, and my client can provide assistance to cross-examine them. And even more importantly, this was the day that the defendant's case started. The government rested, and the court turned to me and said, Mr. Rubin, do you have any call your first witness, or do you have any witnesses? And my client, I usually have a discussion whether we should testify or not, or based on what the evidence is, and there's no client there. And all I could do was say, we rest. Counsel, is there any evidence in the record that your client had taken the same dosage before? I believe there is evidence in the record that they had been giving that for four months. For four months, the same dosage? I believe they didn't say this. I believe you can infer from the record that they might have been giving the same dosage. He'd been given these drugs for four months. That, of course, leads to another question as to why they were giving him the medication in the first place. I suggest, and I believe, that it was to keep him quiet and sedate him, the exact effect that it gave. But let's assume he had done it all, the same dosage, all the time. It's the government that runs the risk that on this particular day, they overdosed him. They run that risk. If he had showed on the second day of trial and he had the same dosage, then they got lucky. But the third day, maybe they didn't get lucky. The point is, they run the risk. My client had a right to be there at his trial unless he did something to forfeit it. He did nothing to forfeit it. The government drugged him, plain and simple. Inadvertently, recklessly, intentionally, doesn't matter. He has a constitutional right not to attend his trial. And if they do something to him that avoids that, they bear the brunt of it. There's a clear finding by the Court. Prior to sentencing, the Court found defendants claimed that he was drugged or that he merely failed to be aroused, so that he'd come to court that morning is not credible. He made that finding. His failure to appear for trial was a result of a conscious decision he made not to attend. Did you listen to the evidence post-trial, of course, as you say? Well, there were no witnesses called and no cross-examination. What he did was he took the declarations and made that finding. That's the evidence you offered. Well, I didn't offer it. The government put that in in response. But at that point, it didn't seem that there was any mechanism to correct the error because there's no new trial motion available. It's more than 10 days. And I believe that later on before sentencing, I asked to have the verdict vacated because of the drugging, and it was too late. I think at a minimum, at a minimum, that there needs to be a remand for an evidentiary on the effects of Benadryl and the drugging and cross-examination. But I think it's pretty clear. Frankly, I think what happened is pretty obvious. It wasn't too much. I'm sorry. I'm sorry. If you were finishing on that point, I was going to ask you something different. Sure. I noticed that, at least my impression is, that you did not raise the question with respect to your client as opposed to Ms. Chen's for hers as to the number of tests issue which raises the Stevens claim, and then you did not mention the 3G1.3a instead of C in your case. You're waiving those two issues, are you? I didn't raise them, and I guess I waived them. I mean, that would be – I didn't raise them. And that would also include the dangerous weapon instructions. Yes. Okay. Thank you, counsel. The second point I want to make, my second argument, Your Honor, is a simple one. Mr. Hallam was in custody at the time this happened. He was in prison. But even beyond that, he was taken into custody after the events and faced both additional charges, as in this case, and prison discipline for the action. And when he was asked to speak, he did not speak. And the government made reference to his failure to assert his defense prior. That is no different to me, and I suggest that improper commenting on his right to remain silent. It's no different than if the government stood up and Mr. Hallam said, we rest. He was there. He hadn't been drugged. We rest. If the government stood up in closing argument and said, Mr. Hallam had an opportunity to tell you what had happened, and he chose not to. And there'd be no doubt that would be an improper comment on his silence and his right to remain silent. Why is it any different than when they stand up in court and say he had a right to tell the prison officials, the guards, or all those other people what had happened, and he chose not to. It seems to me like there's a very strong difference between those two scenarios. Not this case, but in another case where you have a witness standing there and the accused standing over the body, and the witness says in the front of a police officer, he murdered him. And he doesn't deny it just because he's not in custody yet. He hasn't been arrested. No Miranda warnings have been given. That's normal evidentiary rules. Right. But here he was in custody, and here he was facing prison. Not for this offense. Well, yeah, I believe they sort of, well, I guess it's sort of splitting hairs a little bit. He was in custody overall. He's in custody for something else, but he's not in custody with respect to this particular incident. Well, he was taken at the time by the prison guards, and Mr. Hallam has been in prison for a long time, and he knows what's coming. He knows that at a minimum there's a disciplinary hearing coming. He's under no obligation to tell police officers or law enforcement officers or guards anything. For example, in the case where a person's arrested, not standing over the body, and the law enforcement arrests him or has him in custody, and custody being he's not free to leave. He's certainly not free to leave. That you comment on that he didn't tell the police officers what his story was. It's no different here. It's saying you didn't tell the prison officials. He didn't tell the prison officials what his explanation was. So why can you believe it now? That's exactly what you can't do. So I will leave my time, and if Ms. Chen needs that, but I believe we have two independent bases to reverse his conviction and go back to trial one more time. Thank you, counsel. We'll hear from the government. Thank you. May it please the Court, Craig Nisaki for the United States. I'd like to begin in reverse order if that's acceptable to the Court and address the issues regarding Mr. Hellam first. First, to correct a statement by counsel, there was a declaration submitted by Kathleen Royce. She was the medical administrator at the prison in which you don't need to infer anything from that declaration. She says very directly that Mr. Hellam was receiving the exact same medication, the exact same dosage for several months prior to this day where he was absent from trial. So it's very clearly, and that's at GER page 8 and line 12 through 14. Now, the question before the Court with respect to Mr. Hellam's absence on that third day of trial is simply whether or not the Court made a clear error in concluding that Mr. Hellam's absence on day was voluntary. Counsel has tried to characterize the issue as whether or not Mr. Hellam had misbehaved to such an extent that the Court was in the right in barring him from the courtroom on that day. Clearly, that's not what happened here. The only issue is whether or not Mr. Hellam gave up his right, voluntarily waived his right to be present at trial on that third day. And I think if we look at the record as a whole, not just that morning, but you could look at just that morning, but if you look at the record as a whole, which includes several prior instances of Mr. Hellam misbehaving very, very badly, not only jeopardizing other inmates at the Metropolitan Detention Center where he was initially housed, but also jeopardizing in a very serious way the health and safety of the U.S. Marshals Service that was required to bring him to court, the Bureau of Prisons personnel. I mean, throwing one's urine and feces at somebody is a very dangerous proposition. So what they confronted on the third day of trial was Mr. Hellam in his bunk with the sheet pulled up over his eyes, lying there motionless on his bunk. Now, counsel attempts to argue that that is consistent with someone who has been drugged, as it's been referred to. I disagree. I disagree. I think it's entirely inconsistent with someone that has been drugged. Someone that's been drugged and goes to bed will be thrashing about all night. They won't be lying there motionless in the morning with the sheet neatly pulled up over their eyes, lying motionless. And so if we look at that, if we look at the declaration of Kathleen Royce, if we look at the declaration of Lieutenant James and U.S. Deputy U.S. Marshal Bennett, it's very clear that Mr. Hellam was, again, on the third day of trial, playing games with the court, trying to disrupt the proceedings, as he had in the past. There was absolutely no evidence to the contrary whatsoever that was submitted to the court. Mr. Rubin, if he wanted to, could have submitted his own declarations. He chose not to. If Mr. Rubin wanted to, he could have asked for the witnesses to be brought into court so they could be cross-examined. Simply chose not to do that because in light of Mr. Hellam's history, there was no question in anyone's mind what he was doing, even on the third day of trial. When this information was brought to our attention, Mr. Rubin himself did not ask for additional time to go talk to the defendant, to go check out the allegations, to ask for a recess, to even put in a call to prison. Everyone knew what was going on. Mr. Hellam, for lack of a better word or phrase, was up to it again. And that's what the court found, that his allegation communicated through his client, I mean through his lawyer, that he had been drugged, simply not true. Now, we can take Mr. Rubin's analysis of the effects of Benadryl on the body, but what is true and what is undisputed is Mr. Hellam was a big man, 6'1", 230 pounds, was receiving the same medication in the same dosages for several months. Now, I don't know what the effects are. I know what the effects of Benadryl would be on me. I don't necessarily know what they would be on a man that size who had been receiving the medication for that long. And I don't think we need to know. All we need to know is what evidence was presented to the district court and whether or not his decision, Mr. Hellam's claim, lacked credibility and was clear error. And I don't think we can make that finding. With respect to the issue of silence, again, I think Mr. Rubin mischaracterizes the record to a certain extent. There was not a single instance that I commented on in closing argument that involved this scenario, where a prison guard went up to Mr. Hellam and told him while he was in handcuffs or whatever, said to him, you know, what did you do here? And Mr. Hellam remained silent. That simply did not happen. The only instance involving silence of the three that are in dispute is when the prison guards ran up to the locked rat cage, virtually in the middle of the assault. And during the assault, the victim was able to get away and crawl towards the sally port where Mr. Hellam chased him down. That was the silence I commented on, the silence essentially during the incident. And I was responding to Mr. Rubin's argument that the prison guards had only seen half the fight. They had seen the middle of it, not the beginning, as in a basketball game, for example. So in that situation, you've got pre-Miranda. You've definitely got pre-arrest because it's virtually during the assault. The law is fairly clear that you can comment on that silence. The other two situations we're talking about did not involve silence at all. They involved statements. So for Mr. Rubin to say this is exactly like the situation where a prosecutor comments on the fact that a defendant did not testify at trial completely ignores the facts. The defendant did not remain silent. The defendant made two statements. And neither one of those statements included the details that Mr. Rubin argued at trial. And I was simply commenting on that inconsistency. And I think the cases are very clear in that regard, that that is proper. Now, let me take a step back and respond to, unless there are any questions about Mr. Helm, I'll move on to Mr. Smith. Mr. Smith? Before you leave, Mr. Helm, you heard my colloquy with Mr. Rubin about the unraised issues. Well, now, the government has already conceded that one of the issues will have to ‑‑ will require a remand. Is there any reason why Mr. Helm shouldn't get the benefit of that? I can't see any reason, Your Honor. All right. What about the ‑‑ with respect to the other issues? Assuming, just for the sake of argument, that we would remand one of the other issues, again, any reason why? I can't see any reason, Your Honor. Although I could call Mr. ‑‑ I'm not pretending to speak for Mr. Rubin. The defendants are in slightly different positions, so there may have been a reason why Mr. Rubin chose not to raise that argument. Mr. Smith is ‑‑ I mean, Mr. Helm is serving a life sentence, so maybe the concurrent versus consecutive issue is not as important to him. But other than that, I see no essential difference between the two. Okay. Well, now, while we're on it, I gather the government concedes that, with respect to the supervised release condition, a number of tests that we have to remand per Stevens. Yes, Your Honor. All right. Now, with respect to Mr. Smith, first, with respect to the Brooksby case, I think this case is distinguishable from Brooksby in the sense that Brooksby omitted entirely an element, which was discussed in a different portion of the jury instruction. In this case, we have a jury instruction that was a complete unit. And if you focus on the complete unit, I believe that a reasonable jury would have made the essential findings for the charge for which Mr. Smith was convicted. But I'd like to ‑‑ I do concede the instruction itself did not make it clear that it was an element of the crime. Your Honor, I would concede that if we focus just on that middle portion, where we're talking about the three items, yes, it did not refer to a dangerous weapon. I would agree with that. But I would like to respond to Ms. Chen's point. Even if we took that middle section and we excluded the first part, which refers to a dangerous weapon, and we exclude the third part, which refers to a definition of dangerous weapon, even if we look at that, I think we're okay. Because at that point, the jury instruction requires the jury to find that the defendant used a prison‑made knife. Now, I don't think Ms. Chen can have it both ways. On one hand, she's saying we've got a styrofoam cup. On the other hand, she's attempting to say that the court virtually told the jurors that they had to find it was a prison‑made knife. That's not true. The jurors had to find that it was a prison‑made knife. So if we accept Ms. Chen's position, which a knife is per se a dangerous weapon, the jurors either had to find it was a knife or they didn't. They either had to find it was a knife or they could have found it was a styrofoam cup. They were not directed to go either way. So I think if we accept what Ms. Chen is saying, then clearly if we just look at those three elements, the jury instruction was sufficient. But I'm not suggesting we do that necessarily because there's more to this instruction. The first part of it refers to this is a charge involving assault with a dangerous weapon. The third portion of it gives a definition of what a dangerous weapon is in this context. And a reasonable jury, looking at that jury instruction, I believe would have ‑‑ What does this sentence appear? A prison‑made knife is a dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury. I'm sorry. I didn't hear the first part of the question. A prison‑made knife is a dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury. It's part of the sentence that begins, the object marked as Governments Exhibit 52 and 53. I believe the court may be referring to several versions of the instruction. There was one version that the defense proposed I think the court just referred to. The instruction that was just given did include the sentence that the court just referred to, that a prison‑made knife is a dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury. So the jury first had to decide whether it was a knife, then a prison‑made knife, and then they went to the second portion or the last portion and had to decide whether or not this particular prison‑made knife was capable of causing death or serious bodily injury. So I believe if we look at the jury instruction as a unit, and I think we have to presume that the jurors in this case did, it contains all the necessary elements for the charge that the defendant was found guilty of. You don't look at them as a unit, however. I'm sorry, Your Honor, if you don't? You said you referred to three parts of the jury instructions, the first and the third, the dangerous weapon. And then you started, I thought, to say, but it's sufficient anyway if we take just the middle portion. I understand, and I'm raising that really for the first time. I didn't argue that point necessarily in the brief, but if we accept what Ms. Chen said, that a knife in and of itself is a dangerous weapon, and I believe the law on that point is correct, that a knife is a dangerous weapon. So if a jury confronted with just the middle portion here, was given these three elements, and the last one being the defendant used a prison-made knife, if you accept what she says, that this was not a knife, it was a Styrofoam cup, essentially, then the jurors would have had to decide whether or not that was true, whether or not it was a Styrofoam cup or whether it was an actual knife. If they found that it was an actual knife, then that's sufficient under the law to find that it is a dangerous weapon. But that's not what occurred here, but I'd say that would have been sufficient in and of itself. The jurors had to make the next step and decide whether or not this particular prison-made knife was capable or used in a way that was capable of causing death. We consider the instructions as a whole. The instruction on the elements indicated the third element, the government must prove beyond a reasonable doubt that the defendant used a prison-made knife. In separate paragraphs, but part of the same instructions, the instructions advise the jury that Smith was charged with assault with a dangerous weapon. And that a prison-made knife is a dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury. That's correct, Your Honor. I believe that this jury instruction as a whole adequately instructed the jury on that point. Counsel, would you comment on the reference to 5G1.3A instead of C issue? Yes, Your Honor. It's clear that, and I look back at Mr. Hellam's case as well, and the court did refer to 5G1.3A in that case as well. So it appears that it was a mistake that occurred in both situations. But I guess the issue is whether or not the case should be remanded for further proceedings. I think if we look at the record, it's very clear that even if there was a mistake with respect to the court's application of that subsection, it's very clear what the court would have done. The court did the same thing in both Mr. Hellam's cases. You're arguing harmless error? Yes, Your Honor, exactly, harmless error. In both Mr. Hellam's case and Mr. Smith's case, the district court was very careful to explain its reasons for imposing a consecutive sentence as opposed to a concurrent sentence. And even though there may have been an error in which subsection was referred to, I think it's fairly clear that based on the characteristics of these individual defendants, the nature of the crimes they were committed, that the court felt obligated from a policy perspective, not from a guidelines perspective, but from a policy perspective, from a public policy perspective, to impose a consecutive sentence, primarily out of its concern for safety of the public. So even if there was a technical error, I believe the error was harmless because the court, if faced with the issue again, would have done exactly the same thing. We look at 18 U.S.C. 3742F1. It says, If the court of appeals determines that the sentence was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines, the court shall remand the case, underline, the court shall remand the case for further sentencing proceedings with such instructions as the court considers appropriate. All right. I recognize that. I don't believe it's – well, it's clear that there was an error made in terms of the section that was referred to. But I believe under the – The question is whether to remand. The question is whether to remand. How would that language? Well, I understand that, Your Honor. I think the Cantrell and Mix cases in Mayweather as well have recognized that there is a harmless error analysis that applies in this area. But other than the harmless error analysis, I will agree that the court made a mistake in referring to that subsection. If there are no other questions, Your Honor, I'll sit down. Thank you. The appellant has 38 seconds. Use them wisely. I just want to clear the record. I am not arguing, nor does counsel below argue, that a prison-made knife is per se a dangerous weapon. To the contrary. In this case, the jury clearly was instructed it needed to find a prison-made knife, and the evidence overwhelmingly supported that there was a prison-made knife. But the question is, was that prison-made knife a dangerous weapon? And that is a question that this court can't answer. The district court should not have answered. It was for the jury to answer it. And the jury was never asked to answer that question. The government talks about the fourth step the jury would have got to. The jury never would have gotten to a fourth step because it was instructed that there are three elements of this offense. The third element was use of a prison-made knife. It was not use of a dangerous weapon. That was error, and it was not harmless beyond a reasonable doubt, and so the conviction should be reversed. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn. Thank you.
judges: Dw Nelson, O'scannlain, Jones